# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **HOLLY SENATORE,** | |
| Plaintiff, | |
| v. | Case No. 13-cv-856 (CRC) |
| **LORETTA E. LYNCH**, | |
| Defendant. | |

## MEMORANDUM OPINION

The Federal Bureau of Investigation hired Plaintiff Holly Senatore as an Intelligence Analyst. As a condition of employment, the FBI requires all new analysts to successfully complete a three-month training course. Senatore, who was diagnosed with a neurological condition at birth, requested various accommodations for her disability before beginning the course. The FBI agreed to nearly all of Senatore's requests, but denied her requests for an in-class note taker and to use notes on course exams. The FBI denied the former request because it did not have a note taker on staff, but instead allowed Senatore to audiotape the class sessions. It categorically denied the latter request, citing a need to assess the competency of its new recruits. Not content with the FBI's response, Senatore chose not to report to the training course and requested, among other things, reassignment to a position that did not require her to complete the course. The FBI declined these requests and, after Senatore again refused to attend the training course, terminated her employment. Senatore filed suit under the Rehabilitation Act, alleging that the FBI discriminated against her because of her disability. Before the Court is the FBI's Motion for Summary Judgment. For the reasons below, the Court will grant the motion with respect to all claims and dismiss the case.

I.    **Background**

A.  Senatore's Medical Condition

Holly Senatore was diagnosed with hydrocephalus as an infant.  Def.'s Statement of

Facts ("SOF") ¶ 2.  Hydrocephalus is a condition marked by a "permanent, excessive

accumulation of cerebrospinal fluid" in the brain.  Def.'s Mot. to Dismiss, or in the Alternative,

for Summary Judgment ("MSJ"), Ex. 6, (Physician's Letter to FBI).  This accumulation results in

increased pressure inside the skull, which in turn impacts the brain's structure.  Id.  Symptoms of

hydrocephalus vary, but generally include motor problems, headaches, and disorientation.  Id.  In

addition to these symptoms, Senatore also suffers from seizures and learning disabilities that may

have been caused by the surgeries she has undergone to treat her condition.  Pl.'s Opp'n to Def.'s

MSJ ("Pl.'s Opp'n"), Ex. 1 (Dep. of Steven Rider), at 28, 44.  These learning disabilities include

"situational memory loss, occasional inattention to detail and retrieval of information, [and a]

different pattern of learning."  Def.'s MSJ, Ex. 6.

B.  Senatore's Employment with the FBI

The FBI hired Senatore as an Intelligence Analyst ("IA") in September 2010.  Def.'s SOF

¶¶ 3–4.  The FBI requires all newly hired IA's to complete an eleven-week Intelligence Basic

Course ("IBC").  Id. at ¶ 7.  The IBC ensures that new recruits like Senatore "have acquired the

core competencies associated with the IA job."  Def.'s MSJ, Ex. 5 (Decl. of Lisa Crowder), at 3.

In a letter to Senatore offering her the IA position, the FBI noted that "[f]ailure to successfully

complete the IBC training may result in dismissal from the FBI."  Def.'s MSJ, Ex. 4, at 2.

Senatore began working at the FBI training academy near Washington, D.C. in October

2010, but was not scheduled to undergo IBC training until January 2011.  Def.'s MSJ, Ex. 5, at

4.  During this interim period, the FBI gave Senatore a temporary work assignment.  Def.'s SOF

¶ 6.  In November 2010, Senatore informed her temporary supervisor, Floyd Wiltz, of her condition and told him that she would need accommodations during IBC training.  Def.'s MSJ, Ex. 3 (Decl. of Floyd Wiltz), at 4.  Wiltz then contacted Lisa Crowder, the chief of the unit in charge of IBC training, to discuss accommodations for Senatore.  Def.'s SOF ¶ 17.  Crowder suggested that Senatore first visit the IBC facility prior to the beginning of the course in order to familiarize herself with the program.  Id. ¶ 18.  Senatore did so on December 16 and observed several classes.  Id.  ¶ 19.  According to Senatore, Crowder introduced her to one class as a "college student," and told the students there that she gets "lost and confused easily."  Pl.'s Opp'n MSJ, Ex. 4 (Decl. of Holly Senatore), at ¶¶ 3–4.  During a subsequent conversation, Crowder purportedly told Senatore: "If you are bad at verbal direction and if that is the type of accommodation that you need, then maybe the FBI isn't the place for you."  Def.'s MSJ, Ex. 28.

On December 20, 2010, Senatore formally requested the following nine accommodations for the upcoming course:

(1) Written, rather than verbal, directions and instructions;
(2) Special consideration for meeting deadlines for assignments;
(3) An "alternative test format" that excludes "multiple choice," "True/False," "Fill in the blank," and "matching" questions;
(4) A note taker during class;
(5) The ability to use notes during the exam;
(6) The ability to take the exam on a computer;
(7) Extra time on the exam;
(8) A separate, quiet area to work for exams; and
(9) Preferential seating in the front of the class.

Def.'s SOF ¶ 22.  The FBI agreed to all but two of these requests:  It refused to provide Senatore with a note taker, or to allow her to use notes on examinations.  The use of notes, according to Crowder, "would have prevented an objective evaluation of Ms. Senatore's competency to perform IA work."  Def.'s MSJ, Ex. 5, at 7.  Notably, the FBI provided Senatore with every

accommodation that Senatore's physician recommended at the time.  See Def.'s MSJ, Ex. 6, at 1–2.

Not content with the FBI's response, Senatore e-mailed Crowder and other FBI officials, writing that she was "being set up for failure" without having a note taker or the ability to use notes during examinations.  Def.'s MSJ, Ex. 12.  She further stated that she would "appreciate" a job within the FBI that did not require her to attend IBC training.  Id.  Several hours later, Senatore sent Crowder another e-mail stating that she would not be attending the IBC training at all.  Def.'s MSJ, Ex. 13.

After failing to attend IBC training as scheduled in January 2011, Senatore asked the FBI to reconsider its refusal to provide her with a note taker and to allow her to use notes on exams.  Def.'s SOF ¶ 36.  Senatore submitted a supplemental letter from her physician, who recommended that "[she] have a note-taker . . . [which] will free [her] from having to write quickly and play catch-up and miss something important."  Def's MSJ, Ex. 16, at 2.  As an alternative to this recommendation, the FBI informed Senatore that it was seeking a security waiver to allow her to audiotape her IBC classes.  Id.  Senatore's physician also noted that "the best and most successful method of testing for [her] . . . [includes] the use of personal and/or class notes to enhance her recall."  Id. at 1.  The FBI, however, reiterated its position that allowing Senatore to use notes on her exam would "fundamentally alter the ability of the FBI to measure her understanding and proficiency level in performing critical job-related skills."  Def.'s SOF ¶¶ 38–40.  The FBI then rescheduled Senatore to begin IBC training on February 28, 2011.

In the course of her correspondence with the agency regarding her requested accommodations, Senatore also requested both a medical hardship transfer to Knoxville, Tennessee and to be placed on "leave-without-pay" ("LWOP") status.  Id. ¶ 45–48.  Senatore had

lived in Knoxville before joining the FBI.  Id.  She supported these requests with a letter from a different physician, Dr. Steven Rider of the Knoxville Neurology Clinic, who had been treating Senatore "for her history of epilepsy."  Def.'s MSJ, Ex. 21.  Dr. Rider wrote that granting Senatore's transfer and LWOP requests was "a medical necessity," and that failing to do so "would be hazardous to her health and would put her at risk for seizures becoming further exacerbated or problematic."  Id.  He later acknowledged in his deposition, however, that Senatore could have gotten the treatment she needed elsewhere, and that he even offered to help her transfer her care to Washington, D.C.  See Def.'s MSJ, Ex. 37, at 20:14, 25:8.  The FBI granted Senatore's LWOP request for the period of January 16 to February 26, two days before her rescheduled IBC training was set to begin.  Def.'s SOF ¶ 48.  The FBI later denied her request for a medical hardship transfer on March 10, 2011, citing the availability of appropriate specialty physicians in the Washington, D.C. area.  Id. at ¶ 55; Def.'s MSJ, Ex. 34.

At no time during her LWOP did Senatore attempt to transfer her medical care from Knoxville to Washington, D.C.  Def.'s SOF ¶ 57; Def.'s MSJ, Ex. 1 ("Dep. of Holly Senatore"), 75–76.[1]  She did, however, request an additional three months of LWOP on February 17, 2011. Def.'s SOF ¶ 56.  The FBI denied this request a week later, on February 24, and informed Senatore that she was expected to attend IBC training beginning on February 28.  Id. at ¶ 58;

---

[1] Senatore claims to have taken steps to seek treatment in the D.C. area prior to taking LWOP, referring to a "new patient form" that Johns Hopkins Hospital staff e-mailed to her in December 2010.  See Pl.'s SOF ¶ 43 (citing Pl.'s Opp'n MSJ, Ex. 16).  The form, however, does not indicate that Senatore actually made an appointment or took any similarly meaningful steps beyond requesting information.  Rather, the form merely provides a questionnaire for prospective patients to complete and return, along with information about how appointments can be scheduled.  Id.  Even if she did make an appointment in December 2010, there is no evidence in the record that Senatore attempted to transfer her medical care to D.C. while she was on LWOP in Knoxville, or after her request for additional LWOP was denied.

Def.'s MSJ, Ex. 23.  Senatore did not do so, Def.'s SOF ¶ 54, claiming that she was being treated by her neurologist in Tennessee, Pl.'s SOF ¶ 54.

The FBI placed Senatore on absent-without-leave ("AWOL") status after she failed to report to IBC training.  Def.'s SOF ¶ 60.  It then terminated her on March 21, 2011 "due to Senatore not reporting to attend [IBC training] at the FBI Academy on 2/28/2011."  Def.'s MSJ, Ex. 32 (FBI Performance Based Recommendation and Action for Holly Senatore); see also Def.'s MSJ, Ex. 35 (FBI Termination Letter to Holly Senatore).

C.  Procedural Background

Senatore contacted an FBI Equal Employment Opportunity ("EEO") counselor on January 4, 2011 to register her complaints about the FBI's accommodation decisions.[2]  Def.'s MSJ, Ex. 49.  After failing to resolve the matter informally, the counselor notified Senatore of her right to file a discrimination complaint with the FBI's EEO office.  Def.'s MSJ, Ex. 47.  She did so in February 2011, alleging that the FBI denied her reasonable accommodations and subjected her to harassment and retaliation.  Pl.'s Opp'n, Ex 31.  Senatore amended her complaint twice.  Following her termination in March, she alleged that the FBI terminated her because of her disability.  Def.'s MSJ, Ex. 48.  Several months later, in July, Senatore added three additional allegations: that she was unlawfully denied (1) reassignment to another FBI position as an accommodation, (2) an additional 90-days of LWOP, and (3) a medical hardship

---

[2] Senatore, in the complaint she later filed with the FBI's EEO office on February 10, 2011, indicated that her first contact with an EEO counselor actually occurred on December 21, 2010.  See Def.'s MSJ, Ex. 47.  From the record, it appears that she may be referring to an e-mail exchange with Lynn Hoffman and Tonya Odom, employees at the FBI's EEO office.  See Def.'s MSJ, Exs. 11–12.  Hoffman e-mailed Senatore on December 21 to inform her of the accommodations that the FBI would provide her during IBC training.  Id.  The following day, Senatore e-mailed Odom and indicated that she did not believe she could successfully complete IBC training with the accommodations provided.  Id.  Senatore did not allege discrimination in this exchange, and the record contains no evidence that she did so prior to January 4, 2011.

transfer to the FBI's Knoxville, Tennessee Division.  See Def.'s MSJ, Ex. 50.  The FBI notified

Senatore that it had accepted these allegations for investigation.  Id.  The FBI then issued a final

decision rejecting Senatore's claims, which she appealed to the Equal Employment Opportunity

Commission ("EEOC").  The EEOC affirmed the agency's decision on March 5, 2013.  Def.'s

MSJ, Ex. 51.

Senatore filed suit in this Court in June 2013 and amended her complaint in December

2013.  See Amend. Compl.  She alleges a variety of violations of the Rehabilitation Act of 1973,

29 U.S.C. § 701 et seq.:  Count One of the Amended Complaint alleges that the FBI failed to

provide her with reasonable accommodations.  Count Two alleges that the FBI subjected her to

harassment, which the Court will construe as a hostile work environment claim.  See infra Part

III.C.  Count Three alleges that the FBI unlawfully denied her an additional 90 days of LWOP.

Count Four alleges that the FBI unlawfully denied her a medical hardship transfer to Knoxville,

Tennessee.  Count Five alleges that the FBI terminated her because of her disability and in

retaliation for filing an EEOC complaint.  Count Six alleges that the FBI labeled her "not

recommended for reinstatement" because of her disability and in retaliation for her prior

protected activity.  See Amend. Compl. § 5 ("Statement of the Claims").  A final claim, not listed

in the Amended Complaint but alleged in Senatore's amended EEOC complaint and referenced

throughout both parties' summary judgment briefs, is that the FBI unlawfully denied her a new

assignment that did not require IBC training.  See Def.'s MSJ 17; Pl.'s Opp'n 25.  Following a

lengthy period of discovery, the FBI moved to dismiss several of Senatore's claims for failure to

exhaust, and moved for summary judgment on all claims.

## II.   Legal Standards

Under Rule 56, the Court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only when a reasonable fact-finder could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "material" only if it is capable of affecting the outcome of litigation. Id. In determining whether summary judgment is appropriate, the Court is obligated to review the "[u]nderlying facts and inferences . . . in the light most favorable to the non-moving party." Id. The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." Thomas v. Dist. of Columbia, 2016 WL 4991470, at *2 (D.D.C. 2016) (internal quotations omitted). In reviewing a motion for summary judgment, the Court will consider evidence in the record, including "depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." Fed. R. Civ. P. 56(c)(1).

"The Rehabilitation Act of 1973 governs employee claims of [disability] discrimination against the Federal Government." Barth v. Gelb, 2 F.3d 1180, 1183 (D.C. Cir. 1993). While the statute itself does not specify the types of discrimination that it prohibits, it incorporates the legal standards and substantive rights of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101. See 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated . . . shall be the standards applied under title I of the [ADA]."). The Rehabilitation Act thus prohibits several types of discrimination, including failure to accommodate, intentional discrimination, retaliation, disparate impact discrimination, and the

creation of a hostile work environment.  See Drasek v. Burwell, 121 F. Supp. 3d 143, 153–54 (D.D.C. 2015) (collecting cases).

### III. Discussion

#### A. Failure to Exhaust

The Court first must address the FBI's contention that Senatore failed to exhaust three of her claims: (1) that the FBI unlawfully denied her LWOP; (2) that it unlawfully denied her medical hardship transfer request; and (3) that it unlawfully refused to assign her to a new position.  Senatore did not include these charges in her initial administrative EEO complaint on February 10, 2011.  Rather, she amended her complaint with these claims on July 19, 2011.  See Def.'s MSJ, Ex. 50.  The FBI contends that because Senatore did not raise these claims with an agency EEO counselor "within 45 days of the matter[s] alleged to be discriminatory" as EEOC regulations require, see 29 C.F.R. § 1614.105(a)(1), she failed to administratively exhaust them.

A defendant, however, "waives the exhaustion defense by failing to raise it in a timely fashion."  Johnson v. Billington, 404 F. Supp. 2d 157, 162 (D.D.C. 2005).  The D.C. Circuit has noted that "although agencies do not waive a defense of untimely exhaustion merely by accepting and investigating a discrimination complaint . . . if they not only accept and investigate a complaint, but also decide it on the merits—all without mentioning timeliness—their failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit."  Bowden v. United States, 106 F.3d 433, 438 (D.C. Cir. 1997).  "Subsequent decisions analyzing Bowden have construed it consistent with its stated rationale— waiver occurs when the agency decides the administrative complaint on the merits without addressing the untimeliness defense."  Nurriddin v. Bolden, 674 F. Supp. 2d 64, 87 (D.D.C. 2009).

The Court finds that the FBI waived its exhaustion defense.  On August 18, 2011, the

Bureau notified Senatore that it "accepted for investigation" the three allegedly untimely claims.

See Def.'s MSJ, Ex. 50.  Both the FBI in a final agency decision, and the EEOC on appeal, ruled

on these claims and found them to be meritless.  See Def.'s MSJ, Ex. 51 ("EEOC Decision").[3]

The FBI, moreover, does not allege that it raised any timeliness concerns prior to filing the

motion currently before the Court.  See Def.'s MSJ 15–18.  The Court therefore declines to

dismiss Senatore's amended claims for failure to exhaust, and will proceed to the merits.[4]

   B.  Failure to Accommodate

      1.  Legal Standard

To survive summary judgment on a failure to accommodate claim under the

Rehabilitation Act, a plaintiff must show that (1) she was an individual who had a disability

within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with

reasonable accommodations, she could perform the essential functions of the position; and (4)

that the employer refused to make the accommodation.  Graffius v. Shinseki, 672 F. Supp. 2d

119, 125 (D.D.C. 2009).  Generally, an accommodation is reasonable if "it seems reasonable on

---

[3] While the parties have not filed the Final Agency Decision as an exhibit, the EEOC's ruling on appeal discusses it.  See Def.'s MSJ, Ex. 51, at 1 (noting that Senatore alleged that she was unlawfully denied LWOP, a medical hardship transfer, and a new assignment, and that the FBI "issued a final decision pursuant to 29 C.F.R. § 1614.110(b)" finding that Senatore "failed to prove that the Agency subjected her to discrimination or retaliation as alleged"); id. at 5 (same). The EEOC's ruling, moreover, extensively discusses these three purportedly non-exhausted claims.  See id. at 3–5.

[4] Even if the FBI had preserved this defense, it is unlikely that Senatore's three additional claims were time-barred.  Notwithstanding the 45-day limit, "[a] complainant may amend a complaint *at any time* prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint."  29 C.F.R. § 1614.106(d) (emphasis added).  By amending her complaint with these related claims prior to the investigation's conclusion, Senatore appears to have timely raised her additional claims.

its face or is ordinary 'in the run of cases,'" and does not impose an "undue hardship" on the employer. Woodruff v. Lahood, 777 F. Supp. 2d 33, 43 (D.D.C. 2011) (quoting Barth v. Gelb, 2 F.3d 1180, 1187 (D.C. Cir. 1993)). Accommodations impose an undue hardship "if [they] either impose[ ] undue financial and administrative burdens on an agency or require[ ] a fundamental alteration in the nature of its program." Id. "The employee has the burden of identifying reasonable accommodations, and the agency has the burden of showing undue hardship." Graffius, 672 F. Supp. 2d at 126 (citing Chinchillo v. Powell, 236 F. Supp. 2d 23–24).

Importantly, "an employer is *not* required to provide an employee that accommodation she requests or prefers, the employer need only provide some accommodation." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc) (internal quotations omitted) (emphasis added). The agency should initiate an "informal, interactive process with the qualified individual" to determine what accommodation is appropriate. Morris v. Jackson, 994 F. Supp. 2d 38, 47 (D.D.C. 2013); see also Ward v. McDonald, 762 F.3d 24, 32 (D.C. Cir. 2014) ("The process contemplated is a flexible give-and-take between employer and employee so that together they can determine what accommodation would enable the employee to continue working."). And if this process fails to yield an agreed-upon set of reasonable accommodations, the D.C. Circuit has instructed courts to assign responsibility in the following fashion:

> Neither party should be able to cause a breakdown in the process for the sole purpose of either avoiding or inflicting liability. Thus, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Id. (quoting EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005)).

### 2.  *Requests for Accommodations during IBC Training*

The Court begins with Senatore's request for accommodations pertaining to the FBI's mandatory IBC training.  The FBI agreed to provide Senatore with seven of her nine requested accommodations, thus declining only her request for a note taker and her request to use those notes on IBC examinations.  Def.'s SOF ¶ 27.  The FBI indicated that it could not have provided a note taker without hiring an additional employee with a Top Secret security clearance, and instead offered to allow Senatore to audiotape her classes.  Def.'s MSJ, Ex. 45.  This alternative was meant to alleviate her physician's stated concern that, without a note taker, Senatore would "write quickly and play catch-up and miss something important when she could instead be listening, take a few of her own notes, and not feel the stress of missing something."  Def.'s MSJ, Ex. 16.

The Court finds no genuine dispute that the FBI's offer to allow Senatore to audiotape her classes was a reasonable accommodation in response to the specific concerns raised by her doctor.  Recording the classes would have enabled her to focus on the classroom presentations and take targeted notes without the purported stress associated with the possibility of missing important points.  Senatore responds that the offer was made only for some of the classes, and that recording the classes might not have been effective due to the time it would have taken her to review and take additional notes from the tapes.   Pl.'s SOF ¶ 40.  As the government points out, however, this response only highlights a separate ground for granting summary judgment to the government on this issue:  Senatore's failure to cooperate with the interactive accommodation processes.  When the FBI informed Senatore of the accommodations it was prepared to make, it invited her to contact the EEO officer if "the provided accommodations prove to be ineffective."  Pl.'s Opp'n, Ex. 25.  Yet, as Senatore herself acknowledges, she flatly

declined the FBI's audiotape proposal, and chose not to attempt the IBC training to see if the arrangement was workable.  Pl.'s SOF ¶¶ 30, 40, 60.  By taking this course of action, Senatore caused a breakdown in the process of finding an agreed-upon set of reasonable accommodations.

Unlike her request for a note taker, the FBI categorically refused to allow Senatore to use notes on IBC exams, which her doctor had claimed would "level the playing field."  Def.'s MSJ, Ex. 16.  The agency justified its refusal on the grounds that the use of notes would "fundamentally alter[] the ability of the [FBI] to measure [Plaintiff's] understanding of and overall proficiency level in performing critical job related skills."  Def.'s MSJ, Ex 25, at 3.  According to the FBI's official description of the IA position, IA's must be prepared from the start to support members of law enforcement and the intelligence community in responding to emergency situations implicating public safety and national security.  Pl.'s Opp'n, Ex. 36.  A firm grasp of the information taught in IBC training is unquestionably key to performing that role.  The agency concluded, however, that allowing Senatore to use notes on exams—let alone someone else's notes, as Senatore insisted—would have made it impossible for her supervisors to determine whether she had adequately learned the course material.  Senatore offers no persuasive reason to question this understandable conclusion.  The Court therefore agrees with the FBI that allowing the use of notes would have posed an undue hardship by "fundamental[ly] alter[ing] the nature of [the IBC] program."  Barth, 2 F.3d at 1187.  Moreover, by refusing to participate in the course or take an exam without notes, Senatore again is responsible for causing a breakdown in the interactive process of determining the appropriate accommodation.  The Court thus finds no genuine dispute that the FBI acted lawfully in refusing to allow Senatore to use notes on IBC exams.

### 3.   *Requests for Extended LWOP and Medical Hardship Transfer*

Senator next claims that the FBI unlawfully refused to provide her with an additional 90

days of LWOP while she was receiving treatment in Tennessee, and that it unlawfully denied her

request for a medical hardship transfer to Tennessee.  Senator frames both claims as a failure to

accommodate and as a form of disparate treatment and retaliation based on her disability.  See

Amend. Compl. 18–19.  To recap the relevant dates:  Senator reported having seizures after she

informed the FBI that she would not be attending IBC training in January 2011.  Def.'s SOF ¶

42.  She requested a medical hardship transfer to Tennessee on January 11, and requested 30

days of LWOP on January 13.  Id. at ¶¶ 46–47.  The FBI placed her on LWOP status from

January 16 to February 26, 2011, and she returned to Tennessee during this period.  Id. at ¶ 48.

On February 17, Senator requested an additional 90 days of LWOP.  Id. at ¶ 56.  The FBI

denied this request on February 24 and instructed her to report to IBC training on February 28,

which she refused to do.  Id. at ¶ 58.  On March 10, the FBI denied the medical hardship transfer

request she had lodged in January.  Id. at ¶¶ 55.  Although the FBI appears not to have provided

Senator a written explanation of why it denied her requests, both sides agree that one of the

reasons was her failure to transfer her medical treatment to Washington, D.C. while she was

receiving treatment in Tennessee.  The FBI contends that this failure is inconsistent with agency

policy on both LWOP and medical hardship transfers.  Def.'s MSJ 3–4.

At the outset, the record clearly establishes that Senator could have received adequate

treatment in the Washington area.  The FBI's Chief Medical Officer, Dr. David Wade, has

submitted a declaration, which is uncontested on this point, attesting that "[a]ny local

neurosurgeon or neurologist would be familiar with the treatment of and ongoing care of Ms.

Senator's condition."  Def.'s MSJ, Ex. 36, at 6.  And Senator's physician in Tenneesee, Dr.

Rider, confirmed in his deposition that the treatment she needed could have been performed by a neurologist in this area.  Def.'s MSJ, Ex. 37, 20:14, 25:8.  The record is also devoid of any indication that Senatore attempted to transfer her treatment during this period.  To the contrary, Dr. Rider testified that he had offered to help Senatore make an emergency appointment with a Washington-area doctor, but that she refused because she "was uncomfortable starting over in another city and was more comfortable at home."  Id. at 25:13–15.  Senatore's desire to receive treatment only in Tennessee, which forms the basis of both her LWOP and medical hardship transfer requests, was thus clearly unreasonable given that the job she was hired for was in Washington.

Moreover, the FBI's denial of Senatore's LWOP and hardship transfer requests were consistent with Bureau policy.  Regarding the former, the parties have not provided the Court with the FBI's full LWOP policy.  An excerpt referenced in an e-mail from Senatore to her supervisors, however, indicates that it is designed to enable employees "to recover from illness or disability not of a permanent or disqualifying nature, when continued employment or immediate return to duty would threaten the employee's health or the health of other employees."  Def.'s MSJ, Ex. 31.  The policy thus assumes, as the FBI argues, that the employee actually intends to *return* to work in his or her existing position upon full recovery.  Senatore's actions reflected the opposite of such an intent:  She refused to return for the IBC; she failed to transfer her medical treatment to the Washington, D.C. area despite offers from her doctor to assist her in doing so; and she sought a medical hardship transfer request to a position in Knoxville, Def.'s MSJ, Ex. 21.  The great weight of the record thus supports the FBI's apparent belief that Senatore was not interested in completing IBC training by the time she renewed her LWOP on February 24, 2011.  As a result, the Court agrees with the government that granting

her an additional 90 days of LWOP would have been inconsistent with the purpose of the LWOP

policy.  In light of this inconsistency and the record evidence establishing the ease with which

she could have transferred her medical care, the Court finds that no reasonable jury could find

Senatore's extended LWOP request "reasonable on its face or . . . ordinary in the run of cases."

Woodroff, 777 F. Supp. 2d at 43 (citing Barth, 2 F.3d at 1187).

As for Senatore's request for a medical hardship transfer, the FBI's policy on such

transfers states:

> Conditions existing prior to an employee's [entry on duty] will generally not be
> considered of a hardship nature. Hardship transfer may be granted, consistent with
> staffing needs, for articulated medical reasons such as the need to be in a specific
> geographic area or near a specific medical facility to address the health needs of
> the employee, spouse, child, or legal dependent…. Alternatives to permanent
> transfer must first be examined, such as requesting temporary hardship transfer. A
> permanent hardship transfer should not be the first course of action.

Def.'s MSJ, Ex. 52.  As noted above, both the FBI Medical Director, Dr. Wade, and Ms.

Senatore's treating physician, Dr. Rider, have indicated that she could have received adequate

treatment for her condition in the Washington, D.C. area.  Accordingly, the record strongly

suggests that it was not medically necessary for Senatore "to be in a specific geographic area or

near a specific medical facility," id., when she submitted her medical hardship request.  That

alone provided the FBI good reason to deny the request.  Dr. Wade also concluded, based on his

review of Senatore's medical records, that the seizures she reported were associated with her pre-

existing condition and its treatment.  That, too, generally disqualified her for a hardship transfer.

Thus, no reasonable jury could find that a hardship transfer was a reasonable accommodation

under the circumstances.

Accordingly, the Court will grant summary judgment for the government on Senatore's claims that it failed to accommodate her disability by rejecting her requests for extended LWOP and a medical hardship transfer.[5]

### 4.   Request for Reassignment to a New Position

Senatore's remaining reasonable-accommodation claim is that the FBI unlawfully refused to assign her to a new position that did not require her to complete IBC training.  This request, too, is unavailing.  The EEOC offers the following guidance concerning reassignment as a reasonable accommodation:[6]

> The longer the period of time in which an employee has adequately performed the essential functions, with or without reasonable accommodation, the more likely it is that reassignment is appropriate if the employee becomes unable to continue performing the essential functions of the current position due to a disability. If, however, the probationary employee has never adequately performed the essential functions, with or without reasonable accommodation, then s/he is not entitled to reassignment because s/he was never "qualified" for the original position.  In this situation, the employee is similar to an applicant who applies for a job for which s/he is not qualified, and then requests reassignment.  Applicants are not entitled to reassignment.

Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Enforcement Guidance No. 915.002 (Oct. 17, 2002).  Senatore was clearly a

---

[5] Because Senatore has not offered any persuasive evidence showing that other FBI employees were granted LWOP or medical hardship transfers under similar circumstances, or that the FBI rejected her requests because she had previously complained about disability discrimination, the FBI is also entitled to summary judgement on Senatore's disparate-impact and retaliation claims premised on these issues.

[6] While the Court is not bound by the EEOC's guidance, it "must give the EEOC's interpretation of its own regulations 'controlling' weight." Alston v. Washington Metro. Area Transit Auth., 571 F. Supp. 2d 77, 83 n.3 (D.D.C. 2008) (citing Long Island Care at Home Ltd. v. Coke, 551 U.S. 158, 171 (2007)); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) ("As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.") (internal quotations omitted).

"probationary employee . . . [who] never adequately performed the essential functions" of her job.  Id.  The FBI conditioned Senatore's employment upon successful completion of IBC training, and informed her that she would "be required to serve an initial one year probationary period."  See Def.'s MSJ, Ex. 4.  Senatore, however, never completed—or even attempted to complete—the IBC training course and was thus not entitled to reassignment.

Senatore's argument also fails because she "had an obligation to demonstrate that there existed some vacant position to which [s]he could have been reassigned."  Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1304 n. 27 (D.C. Cir. 1998).  "[I]t is the plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions."  Faison v. Vance-Cooks, 896 F. Supp. 2d 37, 60 (D.D.C. 2012) (internal quotation omitted); see also McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 4–5 (D.C. Cir. 2010) (affirming that an employee's request for reassignment to a receptionist position was not a reasonable accommodation where there was no receptionist position available).  Senatore made two informal requests for reassignment via e-mail, first stating that "I would appreciate a job as a GS-11 where I am able to utilize my research, interpretive, and analytical skills yet not go to the [IBC] Academy."  Def.'s MSJ, Ex. 12.  In a subsequent e-mail, she similarly requested only "that the bureau place [her] in a position where [she] will be able to adjudicate [her] duties as a GS-11."  Def.'s MSJ, Ex. 14.  Neither of these requests identifies a vacant position that she could fill.

For the above reasons, the Court concludes that the FBI made reasonable efforts to accommodate Senatore's medical conditions, and that it had sound reasons to deny her requests for additional leave without pay, a medical hardship transfer, and reassignment to a different

position than the one for which she was hired.  The government is therefore entitled to summary

judgment on these claims.

C.  Hostile Work Environment

The Court now turns to Senatore's hostile work environment claim.[7]  "To prevail on such

a claim, a plaintiff must show that [her] employer subjected [her] to discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment."  Baloch v. Kempthorne, 550 F.3d

1191, 1201 (D.C. Cir. 2008) (internal quotations omitted).  The Court must "look[ ] to the

totality of the circumstances, including the frequency of the discriminatory conduct, its severity,

its offensiveness, and whether it interferes with an employee's work performance."  Id. (citing

Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).  This standard is "demanding."

Whorton v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 334, 350 (D.D.C. 2013).  In

assessing hostile work environment claims, courts are not enforcing a "general civility code for

the American workplace."  Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75,

82 (1998)).  Accordingly, "conduct . . . merely tinged with offensive connotations" is

insufficient.  Id. (quotations omitted).  And crucially, "it must be clear that the hostile work

---

[7] Senatore's Amended Complaint includes a count of "harassment based on [Senatore's] disabilities," but not a formal hostile work environment count.  Second Amend. Compl. 19.  The FBI argues that Senatore has failed to state a claim of hostile work environment, correctly noting that "[t]here is no separate cause of action for disability harassment under the [ADA] or the Rehabilitation Act."  Def.'s MSJ 30 (quoting McFadden v. Wash. Metro. Area Transit Auth., 168 F. Supp. 3d 100, 110–111 (D.D.C. 2016)).  Courts, however, have recognized hostile work environment claims "[e]ven when a claim is not set forth . . . in a separate count," so long as "the plaintiff expressly identified a hostile work environment claim in her complaint and provides some factual support for that claim."  Holmes-Martin v. Leavitt, 569 F. Supp. 2d 184, 191–92 (D.D.C. 2008) (internal quotations omitted).  Senatore has done that, alleging that the FBI "subject[ed] her to a hostile work environment which caused Complainant to experience a new form of seizure activity," Second Amend. Compl. ¶ 3, and providing sufficient factual support for the Court to proceed to the merits of the claim, see id. at ¶¶ 41, 45, 55.

environment was the result of discrimination based on a protected status." <u>Ragsdale v. Holder</u>,

668 F. Supp. 2d 7, 26 (D.D.C. 2009) (quoting <u>Childs-Pierce v. Util. Workers Union of America</u>,

383 F. SUpp. 2d 60, 77 (D.D.C. 2005)).

Senatore alleges that the following incidents created a hostile work environment, all of

which stem from her interactions with FBI training director Lisa Crowder:  Senatore asserts that,

in a telephone conversation on December 14, 2010, she asked Crowder about the feasibility of

her accommodations for IBC training, to which Crowder purportedly replied, "I just don't see

how they could be . . . [w]e have never had anyone with your kind of disabilities here before."

Pl.'s Opp'n MSJ, Ex. 28.  When Senatore visited the IBC facility two days later and audited

several classes, she claims that Crowder introduced her to the class "as a college student even

though she knew that [Senatore] had a Master's Degree," and told the class that Senatore "gets

lost and confused easily."  <u>Id.</u>  And when Crowder drove Senatore home from the facility later

that day, Senatore noted that she would need written instructions for exams and assignments in

class.  Crowder purportedly responded: "You can see from the style of the class that written

instruction is not possible.  If you are bad at verbal direction and if that is the type of

accommodation that you need, then maybe the FBI isn't the place for you."  <u>Id.</u>[8]

Crowder denies having made the statements Senatore describes.  But even if she had

made them, the alleged statements cannot support a hostile work environment claim.  Crowder's

---

[8] In addition to the statements from Crowder, Senatore also alleges in her Amended Complaint that she was not assigned a mentor like her other colleagues were, that her workstation was "located far from the rest of the newly hired [IA's]," that she did not receive IBC training materials, and that she was "rarely invited to join unit social activities."  Second Amend. Compl. ¶ 28.  Senatore, however, has not submitted any evidence to support these allegations apart from her own deposition testimony and does not argue in her Opposition to the FBI's Motion for Summary Judgment that the alleged conduct contributed to a hostile work environment.  <u>See</u> Pl.'s Opp'n MSJ 28–30.  Even if she had done so, these allegations do not meet the demanding hostile work environment standard.

alleged misidentification of Senatore as a college student is unrelated to her disability.  And even viewed in the light most favorable to Senatore, Crowder's remaining comments are nothing more than isolated statements that were, at worst, only "tinged with offensive connotations," Whorton, 924 F. Supp. 2d at 350, and as such, could not have meaningfully altered Senatore's conditions of employment.  Baloch, 550 F.3d at 1201.  The Court will therefore grant summary judgment in favor of the government on Senatore's hostile work environment claim.

    D.  Discrimination and Retaliation

Senatore's two remaining claims are that the FBI unlawfully terminated her employment, and unlawfully refused to recommend her for reinstatement.  In both claims, Senatore alleges that the FBI's decisions were motivated by both discrimination and retaliation.  See Amend. Compl. 20.  The Court will apply the familiar three-part burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to these claims.  See Smith v. Dist. of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005) ("Although the framework was established for Title VII cases, our sister circuits have all accepted its application to [disability] retaliation suits . . . as we do now."); see also Hancock v. Wash. Hosp. Ctr., 908 F. Supp. 2d 18 (D.D.C. 2012) (applying the McDonnell-Douglas framework to plaintiff's claim that she was fired because her disability).  Under this framework, once the plaintiff establishes a prima facie case of discrimination and the defendant retorts with a "legitimate, nondiscriminatory reason" for the adverse employment decision, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of [disability]?"  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802–05).

The FBI asserts that it terminated Senatore because she did not complete—or even attempt to complete—the IBC training.  See Def.'s MSJ 29 (citing Senatore Termination Letter, Ex. 51); Def.'s MSJ, Ex. 32 ("FBI's Performance Based Recommendation for Holly Senatore"). The FBI informed Senatore in its offer letter that "[a]s a condition of employment as an Intelligence Analyst, training must be completed successfully.  Failure to successfully complete the IBC training may result in dismissal from the FBI."  Def.'s MSJ, Ex. 4.  After the FBI denied Senatore's requested for extended LWOP, it ordered her to attend IBC training on February 28, 2011.  Def.'s SOF ¶ 60.  Senatore declined to do so and she was fired.  Id. at ¶ 60–64.

Senatore has not offered evidence that the FBI's stated reason for terminating her was pretext for discrimination or retaliation.  Instead, she insists that "[t]here was no hard and fast requirement that Plaintiff attend the Feb. 28 2011 class or be terminated."  Pl.'s Opp'n MSJ 31. She argues that the FBI's decision to terminate her will make it difficult for her to find employment in the future, which, she alleges, indicates that the FBI did so "with clear intent to damage her career prospects going forward."  Id. at 32.  Yet she presents no evidence whatsoever of such intent.  The Court finds that Senatore has not met her burden and will thus grant summary judgment for the FBI on this claim.[9]

---

[9] Senatore similarly does not offer any evidence or argument in support of her claim that the FBI decision to not recommend her for reinstatement was discriminatory.  See generally Pl.'s Opp'n MSJ 30–32.

**IV.      Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment with respect to all of Plaintiff's claims and dismiss the case.  A separate Order

accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:   December 21, 2016